Please be seated. So we have two calendars today. One is the motions calendar where we have Iraq Telecom Limited v. IBL Bank S.A.L. 22540. And I understand counsel are here for that motion. After we hear argument on that motion, we'll turn to the revised argument calendar. And I understand all counsel are present for the cases to be argued on that calendar. In Stallworth v. Joshi, 21170 and Inebi v. Doss, I hope I'm pronouncing that correctly, 21173. In the remaining matters on today's revised argument calendar, Evans v. United States Department of Education, 211521 and Cosmetic Laser v. Twin City Fire Insurance Company, 212160, those are on submission, are deemed submitted, and as to those, we'll reserve decision. So we'll hear, we'll proceed with argument in Iraq Telecom v. IBL Bank 22540. Mr. Schaffer. Good morning, your honors. May it please the court. Derek Schaffer from Quinn Emanuel. I'm here on behalf of moving appellant Iraq Telecom. Your honors, all we are respectfully urging today is continued preservation of the status quo through continued attachment. Well, Mr. Schaffer, no. That's not really the status quo. This is the same judge who issued the attachment. It's as if she turned you down in the first place. The status quo is what you are upsetting. I don't say that in any negative way. I think you have made a very good case for an attachment. But this is not a case where a judge is sort of entering some kind of injunction that changes the way people operate. You know, she's the person who issued the thing in the first place and then cut it back on further argument. That's the way it's sort of supposed to work. Judge Lynch, let me withdraw my characterization. I credit your honors point, but let me just state it factually. Since late January, the funds at issue have been attached in the accounts at issue. And if that attachment is lifted, there is every indication, and Judge Cote in fact found, that those funds are likely to dissipate or abscond. And I think that those indications have only mounted. And so there's a risk, we would submit to your honor, not only that there will be irreparable harm to my client, but this case that poses important legal questions may be mooted before your honor, before a merits panel can decide it. Isn't this a case, an unusual one in this respect, in which there is irreparable harm to both sides? You know, most of these cases, I hate to go on the supposed likelihood of result, because courts don't do things well when they do things quickly. I wish the Supreme Court would learn that, but in any event, I think we don't do well when we do things quickly. But the question of irreparable harm is what often moves it. But here, it looks as if there is on both sides, and that's my problem. Judge Calabresi, may I speak to that? In terms of irreparable harm, the two sides of that coin. On our side of that coin, we have a party that has been found to be a fraudster at the expense of my client. A party that has indicated that it will be dissipating these funds. We tried to reach some sort of an interim agreement. The question is how much, and what's happening in the arbitration right now? Right now, the arbitration has been stalled because the other side has a maximal extension on their answer by two months. Because they've not paid for the arbitrators, because they sought an extension of time before they could appoint their side of the arbitrators. It is proceeding, but it has been somewhat obstructed. It is going, Judge Calabresi. But we, on the merits, are doing everything we can, while still getting the arguments correct, for the court to decide on the merits. We have already filed our opening brief. We're prepared to file our reply brief within seven days, or sooner, if this court so orders. Within seven days of the other side, which can control their answering brief, we want, Judge Calabresi, the important merits to be decided while these assets are preserved so that there's a real dispute between these parties. In your, I forget which piece of your paper, there's a lot of papers that have come in, you just alluded to it, though. You proposed to the other side that you'd be satisfied if they agreed to keep the reserves in New York at a certain level. And that intrigued me, because that seemed to be a solution that would allow them to continue to do business, so long as they replenish the reserves on a regular basis, while giving you protection that, evidently, I'm not holding you to this because that was a settlement offer, and maybe it's not your first choice. But that seemed, at least, to be somewhat satisfactory to you. So my first question is, or maybe my only question to you about that is, we would have the authority, would we not to impose that? Yes, Judge Lynch, I think you would. Or with instructions from Judge Cote to however it were to be arrived at. I think this court could do it itself, or it could instruct the district court to do it. For example, deny the stay on condition that, or something of that sort. But you would agree that we would have the authority, if we thought it appropriate, to impose a solution of that sort. In order to solve Judge Calabresi's problem of, they're going to be, whether it's irreparable, whether it's quite as bad as they say, they're going to be in a tough spot if this attachment is granted in the full amount. Two points about that. One is, I would respectfully ask that your honors couch it as an order, because the response that we got from the other side was no to that. And there's every indication that they will be, unless they are under a court order, allowing those funds to dissipate. So I suppose we could just set it up that the stay is denied on this condition. And if that condition is not complied with, the stay is granted, something like that. Well, I defer to your honors on the exact formulation. I think that we were comfortable with that result previously, we would be now. But I want to give your honor further comfort. We have already agreed that monies can flow through the correspondent accounts in question, and they will not be affected by the stay, or by the attachment, even if Judge Cote had maintained that. That is to say, what is attached are the bank's funds, the IBL's funds, that are in the correspondent accounts. New monies that flow through, for the sake of depositors who are executing transactions, are not affected by the attachment. They are not meant to be affected by the attachment. We've already agreed to that. So this was on top of that, saying that if they needed 5% of the funds in question to execute day-to-day transactions- I would assume that that would be the case, that that money is there for a reason in the ordinary banking course. I'm not a banker to understand exactly why, but obviously that is not just sitting in the New York bank so that they can get interest on it. There's a reason to keep that money in New York. Well, it is the bank's funds. It's not clear to us from the record that those monies need to be in New York in dollars in order for these transactions to be funded. But we've looked for evidence of that, Judge Lynch. Why is it that those funds need to be there in these amounts in order for other transactions to happen? IBL, to be sure, has liquidity problems around the world, but it's not like the $42 million in question is what makes or breaks for them. It is for my client. If this money goes away, your honors, all of our recourse goes away. The $42 million are the bank funds, not the customer account funds. That is correct, Judge Lohier. They would say that there are other interests of depositors in those funds, but these are by definition. They are by definition of necessity. These are the bank's funds, and when a subset of them were identified as being customer funds, it was agreed that those could potentially be moved. Now, we've asked the other side- Those would be carved out. Those carved, I think it's in the amount of 4.6 or 4.8 million. We've asked the other side, what is the status of those funds? Because the attachment was lifted for a period of days. So we're trying to ascertain, are those monies still there, and did any of the other funds in question move out? We asked that question two weeks ago. Maybe you'll get an answer this morning. We have not had an answer to that question. And just one other, I said it was the last, but it isn't, I guess, another question. What, suppose we did have anything in place. What are the actual security arrangements? I mean, if the money is attached, it still sits there, doesn't it? And if they just chose to move it, they would be in contempt or something? There are three banks, three U.S. banks, reputable U.S. banks that are subject to the attachment order. And they are guarding this money right now. The moment that the attachment gets lifted, to your point, it'll be subject to the direction of IBL, which has offered every indication on every front. They'll do their worst for it. Your alternative settlement proposal, what is the security for that? Who monitors to make sure that that's, is that again, the U.S. banks would be responsible for notifying someone if it went below that level? Judge Lynch, we never got that far. It was in the nature of floating a settlement proposal. The answer that we got back to it was a categorical no. There was no separate proposal, so we never got to brass tacks. But if we were to make that order in the way Judge Lynch has suggested, what should we say about that? I think, Judge Calabresi, it should be on the banks that hold the funds to ensure that it does not drop below the 95% level. And I think we can engage with them to make sure that that is administered properly. I think that the easier way to do this is simply to maintain the prior attachment, which had been in place and everyone had understood how that was working. And we will race, while still getting the merits right, Judge Calabresi, there won't be anything defective about the briefing. But we will do everything within our power to make sure the court can issue its merits decision with the circumstances as they existed two weeks ago maintained. Maintained through the end of the merits briefing and the merits argument so that this court can issue its decision. How is that different from attaching the full amount? Well, I don't think it is, except that it's a very limited period of time in this, given the expedition of the appeal, Judge Lohier, your honors or merits panel will be positioned to decide the appeal just as fast as this court deems appropriate. And that means if you believe that the attachment is not well founded under New York law, you'll be lifting the attachment through your final merits disposition. If we don't proceed in that posture, there's a risk that this case goes away. Or that my client is irreparably harmed because the money, once they flow out of the United States, there's no getting them back. Well, but wouldn't the difference be that to whatever extent they need to have this money? And I guess we'll hear from them about why and whether they do. But my understanding was that this was money that was here for a reason. And that that reason was connected in one way or another to the ability to transact business on behalf of customers. Now if that's false, that's false. But that was my understanding and my thought about the reason why I was struck by your settlement proposal was it seemed to me that that would solve their problem. Because they could use those funds in the United States so long as the funds are replenished from somewhere. And it's not the case that anything they bring to the United States is frozen and they're locked out of this market. Well, again, they have that assurance already and I reiterate it today. Whether it's 95% or 100%, new monies can flow in and they will be unhampered by the attachment in our view. But let me just note this, Judge. Why is that? Wouldn't you be entitled to more? I mean, if you're right, 43 million is not what you're asking. You're asking 90 million, right? Because we understand, to your Honor's point, that if there are monies that are flowing in now on behalf of specific customers and depositors that's different from monies that have been in the accounts and are understood to be the property of IBL, the fraudster. That would create more problems if you can go after the customer accounts. And as a practical matter, we understand that that would be disruptive in the sense that they are complaining of. And I think it is different for the funds that are the bank's funds that have been there. But Judge Lynch, what you're describing is the fact pattern in every case where there is an attachment against a bank. Every bank would say that they can use those monies for depositors and New York has made a judgment not to exempt banks from attachments. Here we have the atypical case where the bank is the wrongdoer. The bank is the fraudster. And so this is really- The bank is a fraudster. The bank contributed to a fraud that was orchestrated by someone else who got most of the benefit out of it. I would quibble with the orchestrated by part of that, because I think they were all in this together in every respect. But to Your Honor's point, there were other co-conspirators. That's certainly true, and we think that they're all jointly and separately liable together. But in many cases where there's attachment against the bank, as Your Honors know, the bank has not done wrong. Its funds are being attached because the statutory requirements have been satisfied, and that is the law laid down by New York's legislature. And there is no exemption for banks based upon the interest of third party depositors or otherwise. Exception for banks, it's a different thing to say no exception for one of a handful of, not even solvent, but most stable banks in a country that's about to collapse. That's what makes it, I mean, that's what makes, allegedly makes the difference. Because in the other cases, there clearly is irreparable harm in one direction and not in the other. Here there is an allegation of something which is a very dramatic irreparable harm. And we'll hear more about it, but that's what makes it different from the ordinary New York law about banks. One further, well, but you could say the same, Judge Calabresi, about other countries. You could say it about Argentina. You could say it about Russia, Venezuela. I mean, there have been countries at different times that have had problems. I don't think it's ever been an exemption from attachment. But one other point, if I may, Judge Calabresi, about this, the irreparable harm and how dramatic it is. We have one way of protecting Iraq Telecom and its recovery in impending arbitration. It's this, it's attachment. If we don't have this, we really have nothing when you look around the planet. But there are mechanisms around the world, in Lebanon and elsewhere, that are protecting the interest of depositors amidst a larger sea of different challenges and concerns. And those mechanisms are very important concerns, but you might want to wait until Judge Calabresi has asked his question rather than talking over him. I'm sorry, Judge Lynch. I only meant to answer the prior. I'm sorry, Judge Calabresi. It's fine. But that's my point, that there is a larger set of concerns that have a larger set of solutions wholly outside of the attachment process. And if you get to the point where there were to be a bankruptcy, then there's a Chapter 15 mechanism for addressing the attachment. But under this framework, it's doing what it is meant to do, respectfully submit, by protecting the assets that my client will be entitled to, we believe, through the pending arbitration. That's what attachment does, and the rest is a larger job that can be handled around the world. We'll hear from Mr. Berger. Thank you, Your Honor. May it please the court, good morning. I'd like to go right to Judge Lynch's question, because this is a very practical problem for the reason that Judge Calabresi pointed out, which is there is substantial, irreversible risk of harm to the bank from the fact that its liquidity is locked out. So let me try to address, Judge Lynch, if I may, your question about their offer. They said, will you agree, only for an interim stay period, but will you agree to maintain 95% of the funds? Now, that's just counterintuitive, because number one, at the time, and you saw it in the record, Judge Lynch, they had already conceded that of the 42 million, 4.5 million could come out. So that's already more than 10%. So the way it works is, this bank is not Western Union. People don't come to the bank and say, here, I have $1,000, please send this $1,000 to my son in Atlanta. What they say is, I have put money on deposit with you, send that $1,000 to my son in Atlanta. The IBL, under central bank regulations, keeps that money in the United States for the benefit of creditors. The evidence on that is entirely one-sided in our favor. We submitted to the district court an auditor's report that said, with the exception of maybe $20,000, all of the funds held in the accounts are held for the benefit of- Well, let's assume I agree with that. It seems to me, and this is what I was suggesting to Mr. Schaefer, that the difference between the attachment and his proposal is that if the money is attached, it's just dead. You can't do anything with it. You can't satisfy the customer's requests of that sort. The alternative proposal, as I understood it, was that you could do what you needed to do for your customers. Money would flow in and money would flow out, but you would be required to maintain something that might approximate how much money you normally keep in those accounts in the United States. In other words, unless the day that the attachment hit was some super day, when by just total fluke, you happen to have $43 million there. I'm guessing that if you told us what the average daily balance was over the previous year, more likely than not it would be somewhere in that range. So that would seem to me to be money that normally, in the normal course of business, you keep in New York in dollars. If that's so, then the proposal that Mr. Schaefer made would prevent you from just pulling that money out of the United States and saying to hell with you, our job is to avoid paying any damages if we lose the arbitration. We're going to close down our US operations and take the money out. That proposal would say, if you don't have that intention, if you just want to keep doing business in New York in the ordinary course, wouldn't you, in the ordinary course, keep a substantial amount of money in those accounts? So that's why the proposal struck me as a workable compromise. But I'm not a banker, tell me why I'm wrong. Let me just start at the end and then go to the beginning. And I'd like to address both points of Your Honor's question, which is, first of all, there were six days between the time when Judge Coate issued her order and when this court issued an interim state. If we were intending to dissipate this money, we would have pulled the accounts out, moved them to Europe in the six days. That's a different question. Could you answer Judge Lindy's question? Yes, and the answer to your question is, money is fungible, therefore replenishable, only if there is an alternative source of money that can be moved out of Lebanon to replenish this. That is a very small margin, and let me tell you why, because the evidence on this is also unrebutted. The only alternative sources of funds that can be used to replenish, which is why their 95% number was way too tight a collar, is number one, the bank keeps, as we said in the reply, Habib Declaration of Paragraphs 12 through 16, keeps accounts in euros, Swiss francs, and British pounds. It had to liquidate 70% of that in order to come up with alternative liquidity when they froze $42 million. There's only 30% of that kitty left. They keep saying, well, there must be some other alternative kitty, and there is only one. And again, we acknowledge this in our affidavits, which is that the bank is required to keep this fresh money, meaning transferable money out of Lebanon. It's got $1.9 billion on deposit. In Lebanon. It's got, in Lebanon, it has a lot of money, but the central bank will not allow them to move it. And don't take my word for it, they proffered the English court decision in the Manukian case, and I commend that to the panel because the judge there said the central bank of Lebanon has the practical ability to turn off the taps to transfer money out of Lebanon. The only transferable money, therefore the only replenishable money, Judge Lynch, is money that is either kept in Europe that can be converted to dollars, which we exhausted 70% of. Cash kept at the counters of the bank, which is $6 million at last count, coming down from 14 in October because people want dollars in Lebanon because nobody's taking Lebanese lira. So, yes, it is certainly a practical solution and one which we would adopt at an appropriate level. But you cannot say that there's this boundless reservoir of replenishable money. It's not a question of boundless reservoir. It's a question of what I understand to be your main argument here. Your main argument is that you will be destroyed because you can't do your regular business if this money is attached. Well, okay. But doesn't that mean that, as you just described it, somebody comes to the bank and says, send this $1,000 to my son in the United States, and this money is sort of what you're going to use to do that? Precisely. So what happens to the other $1,000? I mean, this $43 million that we're talking about, or $42 or whatever it is, again, if it wasn't that this was just the day that somebody gave you $40 million to take to the United States, that money was probably there all along, more or less in that kind of amount, right? And I agree with everything up to the last point, which is balances fluctuate, and that's the nature of account balances. When they said 95%, we said, it doesn't work. Would you be prepared to submit factual information about what the average daily balances were over the past year? Yes, indeed, I have that information, Your Honor. But the point is, there has to be a working balance, because in order to send that $1,000- My problem is, okay, let's assume that, but you haven't agreed, you two haven't agreed. So the suggestion is that we should impose it. Then my question is, who enforces it? Well- And if you have an agreement, okay, but you haven't agreed, because they say 95%, you say that isn't right, and so on. But if we say this is the sensible thing, and I must say it seems sensible, how do we make sure, on the one hand, that you have available to you the monies that can go to your customers and so on, and on the other hand, that you don't get money out of here and liquidate what is potentially their proper judgment? Now, tell me, if I were a district judge, I suppose I'd know an awful lot about that. But I've never been a district judge, and I'd be scared to be a district judge, because these things are too difficult. But who does it? Who makes sure that this behaves, if this is a sensible answer? Yeah, so Judge Calabresi, the answer is shown by the record in this case, which is because the order of attachment resulted in, essentially, writs of garnishment that were served on the banks, the banks enforce it. The banks- Three banks. The three banks. Each of the three banks froze the accounts in their entirety upon receiving the initial ex parte under seal writs that were issued by Judge Cote before she reconsidered. The banks, because they are concerned for their own exposure and liability, do what the court says. If the court says freeze, then they freeze. One of the things that I said to Judge Cote, you may have seen when she said I'm reducing it to $3 million. I said, well, we have a very practical problem, which is if you say that, each bank will freeze to look. It's easy if they say freeze, but if instead of saying freeze, they say what Judge Lynch did, which say it's cool, it's much harder to enforce cool than to enforce freeze. So, Judge Calabresi, there is, again, I think, a very practical solution to that, which is the banks, as they have explained it to us, impose at, more or less, at Iraq Telecom's request, a do not go below number in the account. And so, when $42 million and change was frozen, what they did was they imposed a do not go below number. Judge Cote then said, okay, wait a minute, I don't want to restrain third party transfers. And we said the problem is that provides the opportunity, but not the means, because the means is the money that had been frozen. And all we can do is work off of the float, if essence, paycheck to paycheck. Somebody sends a million dollars to the bank from outside the country. So, we rob Peter to pay Paul and use that million. As long as it remains above that $42 million. Right. So, what, yes, Judge Loyer. So, there's what the banks call a do not go below number. So, if one were to implement Judge Lynch's suggestion in light of the irreparable harm that I believe Judge Calabresi rightly points to, and I don't want to belabor that, I understand you have the argument. But that do not go below number would have to be a workable number, because the bank surely does keep money. And what would be a workable number? Well, the, I would go off of what the district court had said, which is but for these extraordinary circumstances, it would have frozen $8.92 million. But the reality is. No, but that's not calculated according to what would be a workable number. That's calculated based on a projection of what you are for sure going to win in the arbitration, as compared to what is speculative that you would win in the, that they would win, rather, in the arbitration, as opposed to what is speculative. The district court never looked at a workable number. And what we're trying to get is what would be a, what you say is a workable number, and what they say is a workable number. I mean, you understand what we're doing here. Look, if we were to grant the requested stay of the district court's order, then you would have $43 million frozen, that's your do not go below number. If we were to deny the stay, the number would be $3 million, and they would have very, very little security. If we were to say, well, we think Judge Cote is right, that the amount that would otherwise be imposed is $8 million. And so, we are not convinced that an $8 million or nine, whatever it would be, a freezer will break the entire Middle East. Then it would be $9 million, and we could certainly do that, grant the stay in part. But none of that is actually compromised. Each of those things seems to me to be posing this choice, that either they lose any security, or you and maybe the country of Lebanon are crippled. It seems to me there's got to be some number that is more satisfactory than what we would wind up doing in one direction or the other. Now, as Dirty Harry said, the question is, which of you feels lucky? Maybe you're going to win this argument today, one way or the other. But maybe it's a coin flip. Now, if I were the district judge, I might say something like, we have a room over here. Why don't we lock you in it until the end of the day, and you come back with a settlement? And take the roof off, as we used to do when they didn't give us training. Mr. Berger, you've been listening for three minutes. Do you have an answer? I do. I have a record-based suggestion to answer Judge Lynch's question that I believe would be workable for the bank, consistent with the BDL circulars, and provide the additional comfort above the number that Judge Calabresi pointed out as the 8.92 million. I commend the ECF 95, the Habib Declaration, explaining the tranches that are in this account. What it says was, as of the time, the 42 million was frozen. 17.36 million represented funds that the Central Bank of Lebanon required IBL to keep overseas as a source of overseas liquidity to meet the 3% requirement. That number, if anything, has to go up. So they can't go below the 17.36. Because of the Lebanese Central Bank? Yes. Yes, Judge Laurier. The remaining three tranches are all tranches that the auditor identified and that the declarations have proven are held for the benefit of customers. So that equaled the remainder, if you back out 17.36 million. That's the stuff, that's the corpus of funds, if you will, Judge Lynch, on which the bank needs to draw to make good for the fact that it's not Western Union. So a denial of estate condition on maintaining 17.36 million because that reflects what Circular 154 requires to be held as overseas liquidity, gives the bank a practical margin, it gives them access to funds that the auditors have said are held for the benefit of customers, and it provides them ample protection, recognizing that they already have an attached. What I hear is that you're going to have to keep 17.3 million there anyway. So that's not really a compromise. That's what you're already ordered to do, regardless of what we do. They say we're willing to compromise at 95%, and you say that's not a compromise because that doesn't. It seems to me that a compromise is somewhere in between, but maybe I am just too much of a compromiser. Well, the reason I, thank you Judge Calabrese, the reason I mention this as a number is that the bank has to, bank doesn't know from day to day what demands customers will make to transfer funds. All it knows is the minimum requirements. All it knows is that it keeps 20.8 million for the benefit of customers. That's what it has to have access to. So, and that's the amount of money. So, for example, the minute that they conceded that the 4.5 million, first tranche, should never have been frozen because those were frozen inward electronic funds transfers. That, as we said in our opposition to the motion to state, those moved. And in fact, they conceded the appellate brief they filed late last night at page 14, that that 4.5 should have come out. So now we're down to 38, if you will, 37 and change. Of the 37 and change, 38 and the last number I have was, at the end of March, was 38.7 million. So that's, they take the conceded 4.5 out. That still leaves in the account 20.6 million that was held for the benefit of customers. I hear the court loud and clear, and Judge Calabrese's point, which is you already got to keep 17.3 in there. But the reality is the bank is supposed to, under BDL circulars, maintain the 20.7 million it has, free of encumbrances, so it can respond to customer demands. Is that all going to happen in one day? Of course not, as you point out, Judge Lynch. So the question is, as a practical matter, what gives the bank an appropriate margin so that there isn't a run on the bank so people don't say, what happened to all my money? We need some level of comfort. The bank needs a working margin of capital. Their 95% suggestion was totally unworkable. So you're telling me that if something like $30 million was the do not go below number, you could live? I think that's, frankly, Judge Loya, too tight, given that the account balance is at eight. And Judge Lynch had asked this question. But I think that if Judge Calabrese's asking what number above the 17.36 makes sense, if you take the number that Judge Coates said was a reasonable prospect of success, that's 8.9 million. Let's make life easy for those of us who are arithmetically challenged. Nine million plus that, then you're looking at 26 million. That gives the bank, I think, look, I'm not on the phone with the bankers in Beirut, but that gives the bank a plausible margin with which to operate. Mr. Schaefer? How does that sound? I'm not, I will just say, I, maybe unlike my colleagues, am not comfortable, we're not a settling court, but how does that sound? It sounds like my client is going to be facing irreparable harm. I just have to emphasize- You could talk a little more- I'm sorry, Judge Calabrese. It sounds like irreparable harm to me for my client. Because the 42 million, of course, we're not trying to be unreasonable. But the 42 million is really less than 50% of what is expected to be recovered in the arbitration. And the one thing that's clear in what Mr. Berger is telling you is that this money will dissipate. It will, they can say it's on behalf of customers and they can say that this is the money they need to use to fund those transactions. Judge Lynch, I would encourage you to read the declaration that is being cited. It does not- Declaration? It's, I think, it was the declaration that they submitted below. It's, Mr. Steeves, is that correct? Am I saying it correctly? There are three declarations. I can't hear you. Excuse me. There are three relevant- You better keep your masks on if you're together like that. Yeah, it's not a matter of a mask, it's a matter of a microphone. I argued one with a mask at the end of February the first week. It's much easier without a mask, but I'll speak more loudly through the mask. The three declarations are the opening declaration of Kareem Habib at ECF, I believe, 95. There is the reply declaration of Mr. Habib, which is ECF 105. And there is the Nahli Hanassar declaration, which is ECF 97. All three affidavits, and this was my point about irreparable harm to Judge Calabresi, all three explain the mechanism that I've explained to the panel this morning. There is no opposing proof. There's only speculation from Iraq Telecom that says, well, they must have money somewhere that they can come up with to replace this. But there are no facts to support the idea that there's some pot of gold at the end of some rainbow. And could you, one completely different question, more on the merits, I guess, than on any of these proposals. If you, again, I don't understand money. But if I did, I probably wouldn't hold this job. I'd probably be doing something else that involved money. But the- I've never been so happy to have a mask on. There's something intuitive about the idea that freezing this whole $43 million would be a big blow. And on the other hand, if Judge Cote is right, that absent some emergency, the freezing, the attachment would be something like $9 million. It's a little harder to see why that is as traumatic. And indeed, you've kind of just told us that maybe you could live with numbers higher than that. So where is the irreparable harm, not from the entire attachment, which is what Mr. Schaefer is asking. But let's assume hypothetically that we agreed with you rather than with him. That Judge Cote was right to, or certainly within her discretion, or it was not a fear error or fact finding, to say that what you, what they are likely to win is like 8 point something million rather than 43 million. Is that irreparable harm? What's the showing that that is irreparable harm? I was quite candid with Judge Cote on this when one of her questions was, what is the harm from 3, 6, 9, 42 million? And I said, of course, it's a sliding scale. The reason from the harm comes from the restoration of the 42 million stay because the bank is living in essence paycheck to paycheck, depending on incoming funds in order to make outgoing transfers. So obviously, I would be foolish to say to this court, zero is the only number that is workable. So I've tried to be responsive to the court's questions. I understand the answer. And I'm going to shut up completely after this. I just urge you to realize that by sometime tomorrow, if no settlement is reached, we are going to have two and a half choices. One choice is deny. One choice is grant. And as you can hear, you know there are arguments on all sides of this. And you know that we're not certain. The half is we do something crazy, try to settle it ourselves and pick a number more or less out of the air based on some of the things that you've said today. Seems to me it would be much better if you gentlemen and your clients and the banks get together and figure this out and arrive at some reasonable settlement. If you don't, we have no choice but to make some sort of ruling and we will. And if we sound like district judges saying that, well, you got three of us here. Well. But may I have the, thank you, Judge Calabrese, and I hear you, Judge Lynch. Judge Larry, may I have leave to respond to a concern that you expressed, and this will be the last comment I make. I'd like to hear that, yes. Which is, your honor expressed concern about being a settling court. And so our position, to be clear, is that for two reasons that have nothing to do with the question that Judge Lynch wrote about and that Judge Calabrese joined in Capital Ventures 2, there are two reasons the stay should be denied. And those two reasons are that there is a risk of irreversible harm, which is if the bank goes out of business. That can't be restored, whereas their harm is your traditional no equitable relief harm, which is they say, well, I have difficulty collecting a judgment that for some I haven't yet collected. No, don't go down that way. There is irreparable harm alleged and plausible both ways. So I think you get the hint. So the risk is obvious. I think you get the hint. I think the hint to us. There's a risk to both sides, obviously, and I would urge you to settle. I am not of the view that we are here to settle matters, but it always behooves, with the benefit of argument, the parties to think twice before they dig in to particular positions. And I hear some movement on both sides. So if, absolutely, loud and clear, Judge Loria, there was a second part, if I may, and then I'll shut up, which is- You said you'd shut up the first time, but go ahead. Well, I, like every lawyer, have the inability to sit down. Go ahead. But the second point, and this is one that Judge Lynch recognized, the capital ventures panel that Judge Calabresi sat on, which is, the real question is, what is that irreparable harm? I hear Judge Calabresi say, don't go down that road. There's a question of continuing need. This stay can be denied for lack of continuing need without ever reaching the sort of equitable discretion question,  and Mr. Schaffer is going to dispute that. I'll give you 30 seconds, and then we're done. Page 36, please, of Judge Coates' opinion. She explained that attachment is for $2.6 million in Lebanon, where even if we recover the 2.6, getting that out of Lebanon as an international bank is an impossibility. So it's either illusory or factional on that. The second point, as far as this court being a settling court, what we are asking for is continuation of the attachment until the merits briefing concludes. And we will be able, in that merits briefing, to inform the court on these points. And I have a different reading of Mr. Berger's declarations than he does, and I urge the court to read them. This is the last point. It may take me a little bit over 30 seconds. Here's my understanding of where things are with the circulars. There is fresh money that is specially differentiated in Lebanon, and the fresh money cannot be subject to the capital controls. So the fresh money is separately tracked that way. But it does not follow that you need fresh money to back the fresh money. That is not in the declarations. They can have more than a billion dollars in holdings that are backing these transactions that can continue to flow through the correspondent accounts. We all agree. Your merits brief is already in? It is. How long are you going to need, Mr. Berger? Your Honor, they took three weeks. I can't hear you. If I may. Yeah. They took three weeks, we'd like three weeks, but look. Okay, that was the question. Yeah. That was the question. But that's a lot of time in the banking world. I understand that, I understand that. But one thing we're almost certainly going to do, no matter what happens, is to expedite the briefing. And I just wanted to know what the schedule was. Absolutely. So now I know. And if they decide to file faster, we stand by our commitment to file on Saturday. It's already expedited. So let me just say, I think we each, we all have the arguments of the merits for coming out one way or the other. And they're both powerfully made by good lawyers. I don't know what my fellows will do. Maybe I don't know what I will do if you don't settle. But I do know that we'll have to do something. And that you may want to take that chance. And if you do, we'll do the best we can. But you're assuming the risk to use an old tourist. Let me be clear with the court in all of your honors. We take that to heart. Part of my job following today, part of our job on our side, is to have settlement dialogue in earnest. We will do that. Terrific. But there's one last point to make. In CVI 2, it was $100 million. Wait, wait, wait. So we're done. We're done. I think we have the benefit of your arguments. I would urge everyone to talk. So I'm glad you ended in the way that you ended. And if you would get back to us by 5 o'clock tomorrow, that would be very helpful. But we've got to decide. We've got to decide motions. And as I understand it, as I understood it, there is an expedited merits briefing schedule. That's where we are. Thank you, your honors. I know you've heard from us very quickly and you've given us a lot of time. We really appreciate it, all of us. Thank you very much. Thank you very much.